UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Martin Mochu,

     *Plaintiff,*

v.

Advocate Aurora Health, Inc.,

     *Defendant*

No. 20 CV 7035

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Mochu Martin Mochu ("Plaintiff" or "Mochu") brings suit against Advocate Aurora Health, Inc. ("Defendant" or "Advocate"), for employment discrimination in violation of Title VII of the Civil Rights Act of 1964. Currently before the Court is Defendant's motion for summary judgment [Dkt. 49]. The motion is granted in part and denied in part. Mochu's Title VII claims for discrimination and retaliation are limited to the adverse employment action of Defendant's decision to deny Mochu a promotion to technical specialist in 2022. Mochu's hostile work environment claim is also limited to the period after Stephanie Kuhn became Mochu's supervisor in early 2019. Defendant's motion for summary judgment is otherwise denied.

## I.    Background

The following facts are taken from Defendants' Local Rule (L.R.) 56.1 statement and the exhibits filed with that statement [Dkts. 34 through 39, 50, 51], as well as from the affidavits that Mochu attaches to his response brief. [See Dkts. 64-1 through 64-5.] These facts are undisputed except where a dispute is noted.[1]

---

[1]    Summary judgment briefing in this case was conducted pursuant to the previously assigned judge's Standing Order on Summary Judgment Practice. That Order requires

Mochu is a resident of Illinois. He was born in Nigeria and speaks with an accent. He obtained his undergraduate degree in biomedical sciences and became a certified cytotechnologist in 1993. In December 2012, Mochu applied for and obtained a position as a cytotechnologist at ACL Laboratories, which is a part of Advocate. Initially, Mochu's job consisted primarily of screening gynecologic slides for malignancies to determine the presence of abnormal, precancerous or cancerous cells.

The cytology department is a department of approximately twenty-five team members including lab assistants, data entry team members and cytotechnologists. Mochu was the only Black cytotechnologist when he was hired in 2013. At the time Mochu was hired, the supervisor of the Cytology department was Donna Shelk

---

parties to file a joint statement of undisputed material fact. If the parties disagree on whether certain facts are undisputed, "they may file a joint motion prior to filing the motion for summary judgment so the Court can determine whether there is a basis for the alleged disputes." *Id*. The parties were not permitted to file separate statements of undisputed fact. However, the non-movant is allowed to "include facts in its response to the motion for summary judgment that it contends are disputed in order to demonstrate that a genuine issue of material fact exists that warrants denying the motion for summary judgment." *Id*. The non-movant "must include citations to supporting materials" and attach those materials to its brief, and the movant "may respond to those facts in its reply." *Id*. Prior to moving for summary judgment, Defendant filed a motion seeking to resolve the parties' impasse regarding whether there was a basis to dispute certain statements of fact. [See Dkt. 44.] The Court issued an order overruling all of Mochu's objections to Defendant's proposed facts and sustaining some and overruling some of Defendant's objections to Mochu's proposed facts. [See Dkt. 47.] Defendant subsequently prepared its Local Rule (L.R.) 56.1 statement of undisputed material facts in accordance with the ruling on the parties' objections. [See Dkt. 51 (sealed version).] At the time of filing, Mochu's counsel had not responded to Defense counsel's request to approve the draft. [See *id*. at 1.] In his summary judgment response brief, Mochu does not raise any objections to the joint statement of facts prepared by Defendant; therefore, the Court considers all of the facts set forth in that document [Dkt. 51] to be undisputed, with one caveat. Since the Standing Order on Summary Judgment Practice allows Mochu to raise factual disputes by alleging them in his response brief and attaching supporting exhibits, the Court will also consider Mochu's affidavits in determining whether there are material factual disputes that preclude summary judgment.

("Shelk"). Shelk's supervisor was Debra Ortiz ("Ortiz"), who was the director of both the cytology and histology departments. [See Dkt. 37 at 5-6 (Tr. 9:16-10:6).] Shelk was assisted by Stephanie Kuhn ("Khun"), who held the title of technical specialist. A technical specialist is a higher-level role than a cytotechnologist. Shelk and Kuhn are both white and American.

Advocate employees are hired subject to a 90-day probationary period during which time the supervisor and the new employee assess the ability of the new employee to perform the position. During the probationary period, the employment relationship may be terminated by either party without notice. In April 2013, at the end of Mochu's probationary period, Shelk gave Mochu a performance review. Mochu received an overall rating of "significantly exceeds expectations." [Dkt. 51, ¶ 12.]  In his next performance review at the end of 2013, Shelk evaluated Mochu as "exceeds expectations." [*Id.*, ¶ 14.] Mochu was satisfied with both of these evaluations.

According to Mochu, when he began at Advocate all of the other employees in the cytology department were afraid of Shelk and Kuhn and "[n]obody was speaking." [Dkt. 51, ¶ 17.] Former cytotechnologist Aimee Hilden ("Hilden"), who is white, told Mochu that there was a lunch "clique" that included Shelk, Kuhn and a few other white employees who ate together in the employee lounge. Hilden told Mochu that she heard Kuhn say that "they can't get a good feeling" about Mochu and "we need to get rid of this guy." [Dkt. 34-1 at 34 (Tr. 124:20-125:12).] According to Mochu, this talk made Hilden "so uncomfortable" that "she left the lunch table." [*Id.*] Mochu did not hear the comments directly and did not know if Kuhn spoke of other employees

3

the same way. According to Mochu, he never heard Shelk make any racist comments but another cytotechnologist, Cara Root ("Root") told Mochu that Shelk used the "N word" all the time. [Dkt. 51, ¶ 102.]

Mochu and other employees informed the on-site human resources consultant, Jeana Chammas ("Chammas") that there was a perception that lunch breaks were not inclusive. According to Chammas, Hilden stated that "she was uncomfortable because there was personal chatter going on with the group." [Dkt. 36 at 9 (Tr. 22:15-21).] Chammas spoke with Shelk about how she "needs to make sure that she's inclusive and her having lunch meal breaks with team members in her group was not being perceived as being inclusive." [*Id.*]

Chammas also testified that Mochu shared with her that there had been inappropriate discussions about his hair. Mochu believed this difference in treatment was racially motivated. Chammas testified that she would "provide coaching to the leader to ensure that that topic wouldn't be discussed moving forward." [Dkt. 36 at 7 (Tr. 15:9–16:13); see also Dkt. 51, ¶¶ 21-22.]

In late 2013 or early 2014, Mochu read a slide and diagnosed it "negative." Shelk, Kuhn and Technical Specialist Mary Bogart took the slide to then-Medical Director Dr. Jamie Walloch ("Walloch"), who changed the diagnosis to "high grade." A pathologist eventually reviewed the slide and agreed with Mochu, diagnosing "negative atrophy." [Dkt. 51, ¶ 23.] Mochu asked Shelk to remove mention of this incident from his record, but Shelk refused. Mochu "knew it affected his evaluation." [*Id.*] Mochu also explains that the changed diagnosis required the patient to undergo

additional, painful biopsies, which ultimately proved to be unnecessary when the pathologist concurred in Mochu's reading.

Shelk placed Mochu on a Performance Deficiency Notice ("PDN") effective September 16, 2014. The PDN stated that "it was generally for not following policy and procedure for High Risk cases and having a level of Quality Variance Reports ('QIVs') above acceptable limits for releasing of results and HR quality review process." [*Id.* ¶ 26.] Mochu disagreed with the PDN because he self-reported his errors, which was a good thing that was encouraged within ACL. [*Id.*, ¶ 27.] Shelk and Kuhn were issuing QIVs "everywhere" and not just with Mochu and Mochu does not know if others had similar types of self-reported errors. [*Id.*, ¶ 28.] When asked why he believed Shelk would issue him a PDN after having given him high ratings in his prior evaluations, Mochu answered: "The thing is that Donna [Shelk] is this kind of person that does things that sometimes are inconsistent and unexplainable." [*Id.*, ¶ 29.] By the end of 2014, Ortiz (Shelk's supervisor) "made sure that they put an end to [the PDN]" and Mochu successfully completed it. [*Id.*, ¶ 30.]

In another instance, both Mochu and another cytotechnologist John Paladino ("Paladino"), who is white, received feedback—not discipline—on an ASCUS (abnormality) miss. Shelk ripped up Paladino's feedback form but not Mochu's; she placed Mochu's in his record. Mochu reported this to Chammas, who told Shelk to apologize. [Dkt. 51, ¶ 31.]

Around the same time, in late 2013 or 2014, one of the technical specialists, Brian Lukes ("Lukes") put a picture of President Obama, superimposed on a monkey,

on a wall that Mochu passed on the way to his cubicle. [Dkt. 51, ¶ 104.] Lukes "quickly put down" the image. [*Id.*] Mochu also testified that in late 2013 or 2014 Lukes used his computer to show people "a picture of Obama dressed in African attire or garb with, you know, monkey looking ears or stuff like that." [*Id.*, ¶ 103.] Mochu did not see the image, and Root told Lukes to stop or he would be fired. [*Id.* ¶ 105.] Mochu did not report the incident to management and does not know if anyone else did. However, Ortiz admitted that she was told about the incident and that she instructed the group that politics was "a very sensitive issue" and "really should not be spoken about in the laboratory." [Dkt. 37 at 28 (Tr. 101:19-23).]

Sometime in 2014 or 2015 (the parties are not specific), Shelk left Advocate under a separation agreement. She was found "not to have been exhibiting competencies in alignment with the expectations of the organization" in relation to employees in her department (including Mochu), employees in other departments and other leaders. [Dkt. 51, ¶ 32.] After Shelk left Advocate, Ortiz (with Kuhn's input) gave Mochu an overall rating of "meets expectations" in his 2014 performance review. Mochu was not satisfied with the rating because he "felt like [he] was doing a good job." [*Id.*, ¶ 34.]

Mohamed Noorani ("Noorani") was hired as the new supervisor. Mochu got along well with Noorani and spent a lot of time helping him on projects. [Dkt. 51, ¶ 35.] Noorani allowed Mochu and other experienced cytotechnologists to do things they had not previously been able to do like molecular training, HPV sign-out, AML sign-out, and Panther training. Noorani also developed a tool to standardize productivity,

6

which measured the number of slides being screened and the error rate. [*Id.*, ¶ 36.] Noorani designed the tool to provide an objective measure of productivity without bias, which would eliminate conversations about favoritism and standardize productivity. [*Id.*, ¶ 37.] Using the algorithm developed by Noorani, Mochu's productivity and work quality were exceptional. [*Id.*,¶ 39.] Noorani conducted Mochu's 2015 performance review, in which he received a rating of "significantly exceeds expectations."

At some point during his tenure at Advocate, Noorani assigned Mochu a rotation to lead the lab's prep area. Kuhn asked if she could work with Mochu and Noorani agreed. About a week later, Kuhn told Noorani that the prep staff did not see Mochu as a leader. Noorani called a meeting with the prep staff, Kuhn, and Mochu to determine the credibility of Kuhn's allegations; the prep staff all denied making the comments that Kuhn had attributed to them. Noorani told Kuhn that she and Mochu needed to work together in that area. [Dkt. 51, ¶ 40.]

Right after this meeting, Noorani called Mochu into his office and asked him why he was the only employee in the department with "two files." According to Noorani's affidavit, the second file consisted of complaints and email exchanges between Shelk and Kuhn. Noorani showed the contents of the folder to Mochu. Mochu recalled that the file contained emails about trying to get rid of him, including an email that Shelk wrote referring to Mochu as a "monkey." Though he could not recall the exact wording, it was something like "when are we going to get rid of this monkey" or "something about the monkey is still here." [Dkt. 34-1 at 47-48 (Tr. 176:12:178:13).]

7

Mochu and Noorani both saw the email and "Noorani got up, took the file, and said … this is crazy or something" and "I'm going to turn this over to Debi Ortiz" and "he walked straight out and went straight … to Debi's office, so [Mochu's] assumption is that he gave it to Debi." [*Id*.] In his affidavit, Noorani stated that he found the emails to be "in complete violation of the just culture assured by the code of conduct and offensive in many respects," and that he "turned the file over to Debbie Ortiz to bring to the attention of those that needed to know because of the content therein." [Dkt. 64-2, ¶¶ 10-12.]

When Ortiz was questioned about the second file at her deposition, she testified that there were two file folders on Mochu because he had worked at Advocate for a long time. She could also recall, for example, having "multiple folders for people who had been in histology for several years." [Dkt. 51, ¶ 42.]

Noorani left Advocate sometime in 2016. [Dkt. 51, ¶ 43] Kuhn interviewed for Noorani's supervisor position and Mochu was part of her peer interview panel. In October 2016, Mochu sent an email to leadership stating that the department did not need a "return to the days of Donna Shelk/Stephanie Kuhn when lack of trust, lies, disrespect and low morale was rampant." Mochu did not mention discrimination on the basis of race, color, national origin or retaliation in the email. [*Id*.]

On March 9, 2017, Mochu sent an email to Walloch, copying Vice President Glenn Janicki, Ortiz and Chammas, expressing concern about the department being returned "to the way it was under Donna [S]helk/Stephanie Kuhn" with discrimination, intimidation, retaliation and a hostile working environment. Mochu

did not mention race, color or national origin because he was trying to get Walloch to do what was right for the organization and "that way all of us, including myself, are protected." [Dkt. 51, ¶ 44.]

Kuhn was not selected as the next supervisor; instead, Katalin Miklos got the job. Mochu felt that things were "very good" under Miklos and that Miklos' selection was a good response to his concerns. [Dkt. 51, ¶ 46.] Miklos rated Mochu "exceeds expectations" in his 2017 review, which included the following comments: "We've come a long way in the last year, and we have tremendous potential. The only way we can become successful and resilient, is if we forge ahead as a united and engaged team. I encourage Martin to be collaborative with all team members, in Cytology, and continue to try to see the best in people." [*Id.*, ¶ 47.]

Miklos left Advocate in early 2019 and Khun was selected as the new supervisor. She was not the only applicant; John Paladino and three other external applicants also applied for the position. [Dkt. 51, ¶ 54.] Ortiz testified that there were no metrics used in hiring Kuhn as a supervisor. Instead, Ortiz followed Advocate interview guidelines and checklists and took into consideration the feedback from those who interviewed Kuhn and the complaints that had been raised against Kuhn. Ortiz concluded—with the input and agreement of the lab's executive director, Mamta Patel ("Patel")—that Kuhn was the most qualified individual for the supervisor position given her performance as a senior cytotechnologist and educational background, including a masters' degree. Ortiz placed Kuhn in the

9

supervisor role in early 2019, with "a desire to move the department forward and not hold onto unfounded fears that were tied to the past." [*Id.*, ¶ 52.]

Mochu was not part of Kuhn's peer review on this occasion. He testified that Ortiz told him that he was not included because they did not like how he asked Kuhn during the previous peer interview how she would be different than Shelk. [Dkt. 51, ¶ 53.] Mochu wrote several confidential emails raising concern about Kuhn being promoted to supervisor, including an email telling Patel that he could not trust Kuhn and she would lie. [*Id.*, ¶ 55.] He referenced the favoritism, discrimination and harassment that existed under Shelk and Kuhn and how employees were worried about their jobs. He did not use the words color, national origin or race but believed they were "implied in this whole treatment thing." [*Id.*, ¶ 48.] Other cytotechnologists also complained about Kuhn, including John Paladino, Jyoti Dharmaiah, and Cara Root (who has separate, ongoing litigation against Defendant). [*Id.*, ¶ 62.] The topics of complaints included racial discrimination, favoritism, and fears Kuhn would keep running the department like Shelk.

Chammas, Patel and Ortiz met with Mochu about his concerns regarding Kuhn being promoted. Ortiz conducted separate interviews with team members in the department to investigate the concerns about Kuhn. According to Defendant, their investigations and review did not substantiate the issues raised in relation to Kuhn's alleged behavior or find evidence of wrongdoing, although Ortiz concluded she could coach Kuhn on her communication and developing relationships in the department going forward. [Dkt. 51, ¶ 50.]

After Noorani left and took his productivity tool with him, Advocate implemented systems that utilize metrics and guidelines to measure productivity and performance. Kuhn kept "tabs on everyone regularly" using spreadsheets that cytotechnologists populate themselves. [Dkt. 51, ¶ 59.] In his 2018 performance review, Kuhn gave Mochu an overall rating of "meets expectations." She noted: "Martin has a healthy questioning attitude; however he needs to better navigate the appropriate time and audience for raising his concerns in a constructive way. Martin is willing to participate when asked, but it would be great for his own engagement to volunteer more often. Martin is read to be trained for sign out within AML and begin participating in more QA activities, when these opportunities arise, he will be brought into the process." [*Id.*, ¶ 61.] Mochu was dissatisfied with this review.

In March 2020, the Covid-19 pandemic hit. Mochu and Paladino volunteered to analyze COVID tests in the molecular department for a few weeks and then, at Kuhn's direction, helped with other work in the molecular department, too. According to Mochu, Kuhn informed the department that people were being sent home on paid furlough. But as the gravity of the situation became clearer, Advocate announced a workforce restructuring policy under which some people would end up losing pay and their jobs. Under the policy, team members were evaluated based on the following criteria, in the following sequence: (1) the degree to which they possessed the skills and accountabilities for the job, (2) active corrective action status, (3) performance review history (two most recent reviews), (4) the existence of an active Performance Improvement Plan ("PIP"), (5) the team member's Services Assessment score as

11

determined by the team member's leader through the completion of the appropriate team member Service Assessment (which was included in an HR Toolkit), and (6) length of service. [Dkt. 51, ¶ 75.] The Cytotechnologist's length of service and seniority were used as tiebreakers in determining who to furlough. [*Id.*, ¶ 81.] Kuhn, with input from Ortiz, prepared an overall "decision making metrics" spreadsheet on all members of the Cytology Department. The spreadsheet was to be used to determine who was to be placed on furlough and who was to remain at work. Mochu was among the six cytotechnologists selected for paid furlough. The remaining three cytotechnologists were selected to work: Cara Root (who is white) and Myrna Hill-Billingsley (who is Black), as well as lab assistant Jyoti Dharmaiah (who is Indian). [*Id.*, ¶ 77.]

Mochu believed that the furlough policy was not followed and made official complaints to Ortiz and HR. [Dkt. 51, ¶ 80.] He asserted that if the policy had been followed, then based on the first factor (skills and accountabilities for the job) he would have remained at work. Mochu is among the most skilled cytologists in the department, has expertise in different areas of the laboratory, was a reliable and very hard worker, stepping up and volunteering for overtime, and rarely called in sick. [*Id.*, ¶ 82.] Mochu was very versatile in the laboratory and could handle all categories of specimens. In his email, Mochu did not mention race, national origin or color because he was "not trying to jump on everything," but he believes it was "implied." [*Id.*, ¶ 78.] Ortiz and Kuhn, along with an HR representative, met with Mochu and

explained to him that the decision was based on an overall score under the policy and Mochu did not score high enough to remain at work. [*Id.*]

Mochu remained on furlough for approximately a month, during which he received full pay. Mochu was then recalled to work and has been working full-time since. After returning from furlough, Mochu received his performance review for the prior year (2019). Advocate's CEO had announced that there was no need to do reviews for the year 2019, but Mochu believed that Kuhn did his review to give him a "bad evaluation" to set him up to "get rid of him." [Dkt. 51, ¶ 86.] Lab Director Patel, in contrast, stated that she thought it was important for her team to provide feedback to team members on their performance even if it did not impact their raises. [*Id.*, ¶ 87.] Kuhn gave Mochu an overall rating of "meets expectations" and summarized his performance as follows: "On a day to day basis, Martin does a good job accomplishing the required tasks. Areas of improvement are related to AAH Behaviors. Martin needs to work on professional and respectful communication with the team and supervisor. Martin needs to respect the chain of command and allow an opportunity for supervisor and director to address the concerns raised. And Martin needs to understand that he may not agree with all the decisions made in the department, but he must accept them in a professional manner to be part of the team." [*Id.*, ¶ 84.] On June 18, 2020, Mochu included comments in the review stating that he disagreed with the review and believed it was in retaliation for raising concerns over the choice of Kuhn as the supervisor given her "past involvement in discriminatory acts" against him and for escalating concerns to upper management. [*Id.*, ¶ 85.]

Mochu filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on June 16, 2020, alleging discrimination on the basis of race and retaliation. On July 31, 2020, he filed an amended charge adding claims of discrimination on the basis of national origin and color. The EEOC issued a notice of dismissal and right to sue letter on August 31, 2020. [Dkt. 51, ¶ 2.] Mochu filed this lawsuit on November 27, 2020. [See Dkt. 1.] The governing complaint alleges Title VII claims for disparate treatment based on race, color and national origin (Count I); harassment and hostile work environment (Count II); and retaliation (Count III).

After Plaintiff filed suit, Kuhn gave Mochu his performance review for the year 2020. She gave him an overall rating of "meets expectations." [Dkt. 51, ¶ 92.] Mochu was dissatisfied with this rating because he believed that he "contributed more than just meets expectations." [*Id.*, ¶ 90.] Mochu complained to HR that his 2020 review was "an act of retaliation, discrimination and intimidation toward me by my supervisor." [*Id.*, ¶ 93.]

In August or September 2021, Advocate posted an opening for a Technical Specialist in Mochu's department. After the job remained unfilled for several months, Mochu applied for the position in November. He was qualified for the position and Kuhn had recommended in the past that Mochu apply for the same position at a sister facility in Wisconsin—which Mochu told Kuhn he could not do because of family obligations in Illinois. [Dkt. 51, ¶¶ 96-97.] About a month later, Kuhn responded to Mochu to acknowledge that she had received the application and told him she would

14

schedule an interview in January 2022. On January 3, Mochu received an email from the recruiter telling him that the position had closed. [*Id.*, ¶ 100.]

It is disputed whether anyone else applied for the Technical Specialist position. Defendant maintains that there was one other employee who applied, and cites testimony from the Team Member Relations Consultant, Stephanie Burnette ("Burnette"). During her deposition, Burnette could not "recall specifically" if there were other applicants, but according to what the "talent acquisition team shared," she "believe[d] there was at least one other candidate." [Dkt. 35 at 10 (Tr. 28:21-29:14).] Burnette provided no other details or names. Mochu disputes that there were any other applicants. He testified that Carrie Breal ("Breal"), the new AP director, told him on February 4, 2022, right before a team meeting, that "we cancelled the technical specialist position" and that Breal wanted Mochu to know before the rest of the group because "I know you are the only one that applied." [Dkt. 34-1 at 74-75 (Tr. 285:19-286:11).]

In Mochu's performance review for 2021, Kuhn gave Mochu an overall rating of "exceeds expectations" and "stated a lot of good things" about him, including that he had made good progress in his communication style. [Dkt. 51, ¶ 94.] Mochu was satisfied with his 2021 review. Nonetheless, he believes the motive for this more positive review was that Mochu had recently complained about not being considered for the technical specialist role.

According to Defendant, its human resources department and leadership investigated the concerns brought forward by Mochu over the years and did not find

any evidence of discrimination or retaliation. [See *id.*, ¶ 114 (citing Burnette, Chammas, Ortiz, Patel depositions).]

## II.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III.    Analysis

### A.    Discrimination Based on Race, Color and National Origin

In Count I of his complaint, Mochu alleges that Defendant violated Title VII by subjecting him to disparate treatment based on his race, color, and national origin. Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer violates Title VII if it "intentionally relies in part" on an individual employee's membership in a protected class when the employee makes an adverse employment decision. *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741, -- U.S. -- (2020). Put differently, "if changing the employee's" race, color, national origin, or other protected characteristic "would have yielded a different choice by the employer," then "a statutory violation has occurred." *Id*. At the summary judgment stage, the question is "'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] caused

17

the discharge or other adverse employment action.'" *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); see also *Nigro v. Indiana Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022); *Purtue v. Wisc. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020).

The parties agree that Mochu is a member of a protected class, but disagree on whether Mochu can establish that he suffered an adverse employment action or that his race, color or national original were the cause. Defendant also argues that Mochu's claim is untimely to the extent that it is based on events that occurred more than 300 days before Mochu filed an EEOC charge. The Court begins by determining whether there are any actionable adverse employment actions. As part of this discussion, it also considers when a claim based on each action accrued for purposes of determining whether Mochu filed a timely EEOC charge. See *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 801 (7th Cir. 2014) ("Under Title VII, a challenge to an unlawful employment practice must be filed within 300 days of the discrete discriminatory action.").

### 1.    Adverse Employment Action

For purposes of Title VII, "[a] materially adverse employment action is one where the plaintiff suffers 'a significant change in employment status.'" *Reives v. Illinois State Police*, 29 F.4th 887, 894 (7th Cir. 2022) (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)); see also *Vance v. Ball State University*, 570 U.S. 421, 429 (2013). However, "not everything that makes an employee unhappy is an

actionable adverse action" because, "[o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). Instead, adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer*, 662 F.3d 448, 453–54 (7th Cir. 2011).

In response to Defendant's motion for summary judgment, Mochu identifies a number of adverse actions, including: (1) Defendant's failure to promote Mochu to the technical specialist position in early 2022 [Dkt. 64, at 16]; (2) corrective actions including PDNs and QIVs in 2014 [*id.* at 19-20]; (3) Defendant's delay in providing Mochu with certain training around 2015 [*id.* at 19]; and (4) Defendant's decision to place Plaintiff on paid furlough for a month at the beginning of the Covid-19 pandemic in March 2020.[2]

***Failure to Promote to Technical Specialist***: Defendant's failure to promote Mochu to the technical specialist position is an adverse employment action that, if tied to Mochu's membership in a protected class, could be found by a reasonable juror

---

[2]      Mochu also argues that Defendant's maintenance of a hostile work environment is an adverse employment action for purposes of his Title VII disparate treatment claim. Since Mochu brings a separate Title VII claim for hostile work environment (Count III), the Court will consider all of the hostile work environment arguments in that section of its opinion.

to support a Title VII claim. *See Wince*, 66 F.4th at 1041 ("A failure to promote can be a materially adverse employment action." (citing *Riley v. Elkhart Community Schools*, 829 F.3d 886, 892 (7th Cir. 2016)).

***2014 Corrective Actions***: During the period when Shelk was his supervisor, Mochu was given PDNs for a self-reported error and for mis-filing a slide. Mochu argues that these corrective actions created "a potential for termination of his employment" and negatively affected his "opportunity for merit increases." [Dkt. 64 at 20.] In support, Mochu offers an affidavit from his former supervisor, Noorani. Noorani states that based on his "review of productivity and quality metrics of previous years, plaintiff was one of the best performer[s] at ACL and yet many under-performers received better annual review evaluations and merit increases compared to Mochu." [Dkt.55-5, ¶ 12.]

Drawing all reasonable inferences in the light most favorable to Mochu, this evidence is insufficient to allow a jury to conclude that the PDNs constituted an adverse employment action. Unfair reprimands and negative performance reviews do not qualify as adverse employment actions unless accompanied by a loss of pay or other tangible consequence. *See Wince*, 66 F.4th at 1042 (verbal reprimand without loss of pay or tangible consequence was not an adverse employment action under Title VII); *Boss*, 816 F.3d at 919 ("Unfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice" for adverse employment action.); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("[N]egative performance evaluations, unaccompanied by some tangible job consequence, do not

constitute adverse employment actions."); *Dirickson v. Intuitive Surgical, Inc.*, 2023 WL 2138973, at *10 (N.D. Ill. Feb. 20, 2023) ("Generally, a [performance improvement plan], without more, does not qualify as an adverse employment action in the discrimination context.").

Here, the only evidence linking Mochu's PDN to his compensation is Noorani's statement. Noorani concludes that other employees received better merit increases than Mochu, but does not provide any supporting facts linking the PDN to lower pay. Mochu does not explain how reviews are tied to pay or provide any data concerning how much other employees were paid or how their performance compared to Mochu's. Without such evidence, a jury would be relying purely on speculation to conclude that Mochu was paid less due to his membership in a protected class. *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."). Given this deficiency, the Court finds it unnecessary to determine whether all or part of Mochu's claim for pay discrimination would be time-barred.[3]

---

[3]     The Court notes generally, however, that "a new cause of action for pay discrimination ar[ises] every time a plaintiff receive[s] a paycheck resulting from an earlier discriminatory compensation practice"—even one that "occurr[ed] outside the statute of limitations period." *Kellogg v. Ball State University*, 984 F.3d 525, 529 (7th Cir. 2021) (quoting *Groesch v. City of Springfield*, 635 F.3d 1020, 1027 (7th Cir. 2011)); see also 42 U.S.C. § 2000e-5(3)(A)("For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.").

***Denial of Training***: Mochu argues that he suffered an adverse employment consequence when Shelk denied him the opportunity to participate in certain training, including QC screening, molecular rotation, HPV sign-out, AML sign-out, and Panther. [See Dkt. 64 at 19.] But it is undisputed that once Noorani replaced Shelk as supervisor by 2015, he allowed Mochu and other experienced cytotechnologists to do things they had not previously been able to do, including specifically molecular training, HPV sign-out, AML sign-out, and Panther training. Mochu has not identified any evidence that the delay in training, which ended years before Mochu filed this suit, affected his compensation or had any other tangible consequence for his career, particularly given these circumstances.

***Furlough***: Mochu was placed on paid furlough for approximately one month at the beginning of the COVID-19 pandemic. There is a factual dispute concerning whether Mochu would have been placed on furlough if, as Mochu maintains, Defendant had properly and fairly applied its furlough policies. But this dispute is not material because Mochu cannot show that his temporary, paid furlough could be considered an adverse employment action for purposes of Title VII. Neither party cites any case law involving furloughs, but it is undisputed that the furlough did not result in a reduction in compensation or other benefits, or an unbearable change in job conditions such as a hostile work environment. Mochu, like the majority of other cytologists in his group, simply did not work for a month. Even if a paid furlough might, hypothetically, cause an employee's skills to atrophy or reduce his career

prospects, see *Barton*, 662 F.3d at 453-54, nothing in the record indicates that occurred here.

Mochu and others testified that being furloughed temporarily placed Mochu at increased risk of losing his job, but that risk never materialized. *Nagle v. Village of Calumet Park*, 554 F.3d 1106 (7th Cir. 2009), is instructive. In that case, the plaintiff was given a suspension without pay, allegedly in retaliation for exercising his rights under Title VII. The court held that since the plaintiff never *served* the suspension, its imposition did not constitute an adverse employment action. The court reasoned that "[u]ncertainty as to whether the suspension will be upheld is not equivalent to actually serving the suspension because the plaintiff does not have to endure the same economic harm." *Id*. at 1020-21. To be sure, Mochu, like *Nagle*, experienced uncertainty about his job for several weeks. But ultimately he did not endure any economic harm—either in the short term due to loss of pay, or the long term due to diminished career prospects. Mochu returned to work after a month and has worked regularly ever since.

## 2. Causation

Having limited the actionable adverse employment actions to the failure to promote Mochu to technical specialist in 2022, the Court now considers whether Mochu has sufficient evidence to let a jury conclude that he was denied the promotion because he is a member of a protected class. To proceed to trial on a failure to promote claim, Mochu can either use the burden-shifting method of *McDonnell Douglas Corp.*

23

*v. Green*, 411 U.S. 792 (1973), or show causation in a holistic manner under *Ortiz v. Werner Enterprises*, 834 F.3d 760 (7th Cir. 2016). See *Riley*, 829 F.3d at 891-92.

Mochu argues that he is entitled to proceed to trial under both the *McDonnell Douglas* and *Ortiz* frameworks. The Court agrees.

### a. *McDonnell Douglas*

The *McDonnell Douglas* framework is meant to "'clarify and simplify'" the task of proving causation. *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)). Under this framework, a plaintiff demonstrates a *prima facie* case of failure to promote with evidence that: "(1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Riley*, 829 F.3d at 892. If the plaintiff meets this burden, the "'burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual.'" *Wince*, 66 F.4th at 1040 (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)). "Pretext is a lie, specifically a phony reason for some action." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403-404 (7th Cir. 2008) (internal quotation marks and citations omitted). Thus, "to show pretext, a plaintiff must show that (1) the employer's nondiscriminatory reason was dishonest, and (2) the employer's true reason was based on a discriminatory intent." *Id.* "Pretext does not exist 'if the decisionmaker honestly believed the nondiscriminatory reason' given by an employer

24

for an adverse employment action." *Downing v. Abbott Laboratories*, 48 F.4th 793, 804 (7th Cir. 2022). "So, in evaluating pretext, the focus is on what the decisionmakers knew, and their perceptions are 'controlling.'" *Id.* at 804-805 (quoting *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010)).

As to the first element, Mochu has established that he is a member of a protected class and that Defendant's decision not to promote him to technical specialist in 2022 was an adverse employment action. As to the second element, Mochu offers evidence in the form of affidavits (including his own) to support the claim that he was qualified for the technical specialist position. [Dkt. 64-1 at 2, ¶ 20.] He also relies on the affidavit of his once-supervisor Noorani regarding his work performance generally. [Dkt. 64-2 at 2, ¶ 12.] He also points to the fact that Kuhn recommended Mochu apply for the same position at a related facility in Wisconsin (which Mochu told Kuhn he could not do because Mochu's family is in Illinois). [Dkt. 51, ¶ 96.] Defendant's brief is silent about whether Mochu was qualified for the technical specialist position, other than to say that the affidavits he submitted are inadmissible under Fed. R. Civ. P. 56(c). [Dkt. 60 at 7-8.] While the Court agrees that the arguments on this issue are thin and mostly undeveloped, Mochu has offered some evidence from which to conclude that he was qualified, and Defendant has not rebutted that showing.

The last two elements of the failure to promote claim substantially overlap. There is no dispute that Mochu was not selected for the position, though the parties disagree on what became of the technical specialist position after Mochu applied.

Defendants maintain the position was pulled so no one was selected for it, and if no one was selected, Mochu cannot show that Defendant promoted someone outside of the protected class who was not better qualified. [Dkt. 53 at 7-9.] Mochu, on the other hand, says that Kuhn pulled the position for a discriminatory reason: so Mochu would not be selected. He also claims that Defendant filled the position several months later with a less qualified white woman named Jennifer Maniatis. The only evidence in the record on this point is Mochu's affidavit,[4] which states that "[o]n or about late November 2022, after having denied me the Cytology Technical Specialist position, and resulting promotion, Defendant hired Jennifer Maniatis, a white woman, as a Technical Specialist." [64-1 at 2, ¶¶ 19.] Mochu sets out in detail why he believes he is more qualified for the position than Maniatis: (1) he has more years of cytology professional experience; (2) he has longer years of service with Defendant; (3) he has conducted more gynecologic, non-gynecologic, and FNA screenings; (4) he has molecular testing, molecular sign-out, and Epic experience; (5) he has taught and mentored team members on how to read non-gynecologic specimens, core biopsies and cell blocks; and (6) he has a medical degree. [*Id.*, ¶ 20.]

---

[4]     The parties' discussion of Maniatis is lacking, to say the least. As best the Court can tell, Maniatis is never mentioned by name in the briefs and is referred to only in Mochu's affidavit. [Dkt. 64-1 at 2, ¶ 20.] Defendant has urged the Court to disregard Mochu's Affidavit in its entirety because it references facts that occurred in late 2022 and early 2023 after discovery closed. [Dkt. 60 at 2, n.2.] District courts are entitled to "require strict compliance with local summary-judgment rules." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 790 (7th Cir. 2019). From the Court's perspective, however, Mochu's affidavit raises a substantial question whether someone outside the protected class who was not better qualified was placed in the role. Given this, and that Defendant had a full and fair opportunity to reply, the Court addresses the issue notwithstanding Mochu's failure to comply with the local rule. See *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (district courts have discretion to strictly apply local rules or "overlook any transgression" (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995))).

Once again, Defendant's reply brief is silent on this issue; it offers no substantive response to these assertions. As a result, the Court is left with no information about whether Maniatis was, in fact, selected for the same position, what the circumstances were surrounding her selection, or whether Mochu was more qualified. As a result, there is a genuine factual dispute concerning whether Defendant promoted someone outside his protected class who is less qualified than him—Maniatis—thus establishing a *prima facie* case of discrimination based on Defendant's failure to promote.

Defendant offers the same explanation discussed above as the legitimate reason for its decision not to promote Mochu: the posting was removed, and no one was hired for the job. But as discussed, the record is far from clear on this point.

Even based on limited information, Mochu has marshaled sufficient evidence showing that the purported decision to take down the job posting was a pretext for discrimination. Defendant needed a technical specialist in late 2021 and early 2022, when Mochu applied for the job; it appears to have needed a technical specialist later in 2022, when it purportedly hired Maniatis; and Defendant suggests no factual basis on which to conclude that it did not also legitimately need a technical specialist in early 2022 when Mochu was informed that the listing had been removed. If there was a change in its needs, Defendant has not identified it, nor does it explain the circumstances under which the listing was removed.

The only other point Defendant raises on this score—that Mochu was not the only applicant for the job—is far from settled. [Dkt. 53 at 10; 60 at 13.] Defendant

27

fails to specifically identify any other applicant by name. Rather, it relies on vague testimony from Burnette, who "believe[d]" there was at least one other applicant, but she could not "recall specifically." [Dkt. 35 at 10 (Tr. 28:14-29:14).] What is more, Burnette's statement is contradicted by Breal's statement to Mochu that he was the "only one that applied." [Dkt. 34-1 at 74-75 (Tr. 285:19-286:11).] In a separate incident, Kuhn told Noorani that members of the prep staff did not see Mochu as a leader; Noorani investigated the matter and told Kuhn he believed she was lying.

Resolving facts and drawing reasonable inferences in Mochu's favor, a factfinder could conclude that Mochu was the only applicant for the technical specialist opening and once Kuhn realized this, she rescinded the post on the pretext that a technical specialist was no longer needed, only for Maniatis to be hired a short time later. Conversely, a reasonable factfinder could accept Defendant's explanation that Mochu was not the only applicant and that Kuhn's earlier recommendation that Mochu apply for a similar opening in Wisconsin evinces a lack of animosity. There are enough disputes about the factual context to preclude judgment as a matter of law on the issue. In the end, it will be up to a jury to assess credibility and decide why the technical specialist role was "pulled"—be it due to race-based animosity, retaliation, lack of department need, or some other legitimate reason—and whether the circumstances that followed establish a discriminatory intent.

### b. *Ortiz*

As an alternative to the *McDonnell Douglas* framework, a plaintiff "may prove discrimination in a holistic fashion, by proffering 'direct or circumstantial evidence of

28

intentional racial discrimination.'" *Wince*, 66 F.4th at 1040 (quoting *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016); see also *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination."). Under *Ortiz*, the Court asks simply "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] ... caused the discharge or other adverse employment action" at issue. 834 F.3d at 765; see also *Lewis*, 36 F.4th at 760 (the court assesses the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself).

The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929. The second and third categories of evidence largely overlap with the evidence just discussed in the *McDonnell Douglas* framework, while the first category provides further support for an inference that Mochu was denied promotion due to his membership in a protected class.

**Ambiguous or suggestive comments or conduct**: According to Mochu's testimony, which is supported by an affidavit from Noorani, Shelk and Kuhn exchanged emails in which Shelk referred to Mochu as a "monkey" and discussed ways of getting rid of Mochu. Use of this highly offensive term, by one of Mochu's

29

supervisors no less, in reference to plans to try to get Mochu fired, supports an inference of intentional discrimination on the basis of Mochu's race, color, and national origin. Though Kuhn's decision to deny Mochu the technical specialist position occurred years later, a reasonable juror could find Kuhn and Shelk's earlier communications inform the causation analysis.

**Better treatment of people similarly situated but-for the protected characteristic**: As discussed above, Mochu has supplied evidence that Maniatis, a white woman, was hired for the technical specialist position, even though Mochu has more experience.

**Dishonest justifications for disparate treatment**: As already discussed, a reasonable jury, resolving facts and drawing inferences in his favor, could conclude that Mochu was the only applicant for the technical specialist opening and once Kuhn realized this, she removed the post on the pretext that a technical specialist was no longer needed, only for Maniatis to be selected. One view of this evidence could be that Defendant has offered a dishonest justification for disparate treatment. Another is that Defendant has offered a legitimate justification for its decision not to promote Mochu to the post. Given this tension, the Court denies summary judgment on Mochu's claims for Title VII discrimination, though that claim is limited to the decision to deny Mochu a promotion to technical specialist in 2022.

## B. Retaliation (Count III)

Count III of Plaintiff's complaint is for retaliation. To succeed on a Title VII retaliation claim, a plaintiff must "present evidence of (1) a statutorily protected

activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)). Like a Title VII discrimination claim, a Title VII retaliation claim may be proven using the *McDonnell Douglas* burden-shifting method or the *Ortiz* holistic method. See *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

**Statutorily protected activity**: Mochu engaged in statutorily protected activity when he filed an EEOC complaint on June 16, 2020 and an amended EEOC complaint on July 31, 2020 based on alleged Title VII violations. Mochu also made numerous internal complaints to higher-ups at Advocate. See *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, 651 F.3d 664, 674 (7th Cir. 2011) ("an informal complaint [to supervisors] may constitute protected activity for purposes of retaliation claims"). It is unclear from the record when Mochu first made clear that he believed he was being discriminated against on the basis of race, color, or national origin. "Merely complaining in general terms of harassment or discrimination, without specifying a connection to a protected class or providing facts to create such an inference, is insufficient" to establish that a plaintiff engaged in protected activity. *McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022). There is evidence that Mochu complained generally of discrimination and harassment prior to 2021. However, the first specific mention in the record of Mochu complaining about harassment based on race, color and national origin is in 2021, when he complained to Burnette. Mochu therefore has not shown that adverse actions that occurred prior

31

to June 2020—including his furlough—were taken in retaliation for his protected activity.

**Materially adverse employment action**: "[T]he standards for actionable adverse action for discrimination claims under § 2000e–2(a) and retaliation claims under § 2000e–3(a) are not identical." *Whittaker v. Northern Illinois University*, 424 F.3d 640, 648 (7th Cir. 2005). "In the retaliation context, an employer's action will be actionable under § 2000e–3(a) if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Washington v. Ill. Dep't of Revenue,* 420 F.3d 658 (7th Cir. 2005)). In response to summary judgment, Mochu asserts that Defendant retaliated against him by placing him on furlough in March 2020 and denying him a promotion to technical specialist in 2022. [See Dkt. 64 at 43-44.][5]

As to the furlough, even if Mochu made specific complaints of racial discrimination prior to his furlough, his paid, short-term furlough, which had no longer-term job consequences, does not rise to the level of an adverse employment action for the reasons explained above. See *Nagle*, 554 F.3d at 1120-21. In contrast, the denial of promotion to the technical specialist role is an adverse employment action, and it occurred after Mochu complained to the EEOC—as well as after he filed this lawsuit complaining of racial discrimination, retaliation and harassment. See

---

[5]     To the extent that Mochu's response can also be read to assert that the adverse employment action is being required to work in a hostile work environment, [see Dkt. 64 at 40-41], the Court considers that argument as part of Mochu's hostile work environment claim, which is discussed in the last section of this opinion.

*Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009) ("the retaliatory denial of a promotion is a materially adverse action").

The last question, then, is whether there is a causal connection between the statutorily protected activity and Defendant's decision not to promote Mochu to technical specialist. Like a Title VII discrimination claim, a Title VII retaliation claim may be proven using the *McDonnell Douglas* burden-shifting method or the *Ortiz* holistic method. See *Swyear*, 911 F.3d at 885. Here, the Court has already addressed why Mochu has shown sufficient evidence that he was qualified for the technical specialist position and that someone less qualified—Maniatis—got the job. But Mochu has not provided any evidence concerning whether Maniatis has engaged in protected activity. So Mochu has not made out a *prima facie* case of retaliation under *McDonnell Douglas*.

When the record is examined holistically under *Ortiz*, there is enough evidence to let a jury decide whether Defendant denied Mochu a promotion to technical specialist in retaliation for complaining about race, color, and national origin discrimination. Defendant's allegedly "dishonest … justifications" for taking down the technical specialist position after Mochu was the only applicant is circumstantial evidence supporting an inference of retaliation. *Joll*, 953 F.3d at 929. Kuhn's "suggestive comments [and] conduct" support such an inference, as well. According to Mochu, in April 2022 he went to Kuhn's office and she "yelled" at him, "insisting that [he] give her examples of how she has been discriminating against [him]." [Dkt. 64-1, ¶ 18.] Mochu says that when he began to speak, Kuhn got up and closed the

door and "started raising her voice over [Mochu] and pounding her desk" until a co-worker entered the room. [*Id*.] Mochu "used that opportunity to exit [Kuhn's] office." [*Id*.] If Mochu's affidavit is believed, it is evidence that Kuhn harbored animosity against Mochu specifically because he complained of discrimination.

Root's affidavit further supports an inference of retaliation. Root states that when she complained at Advocate "about how Mr. Mochu was subject to race discrimination," "Ms. Kuhn threatened me with disciplinary action, and falsely alleged that an associate had made an anonymous complaint against me," which Root confirmed was untrue after talking to a human resources representative. [Dkt. 64-3 at 3, ¶ 14.] In addition, both Root and Mochu maintain that they were the only two employees to whom Kuhn gave performances reviews for the 2019 performance year, though Defendant's president and CEO had announced a flat merit increase without performance reviews for all employees. [*Id*., ¶ 17.] According to Root, Kuhn "isolated each of us from the view of other team members by conducting our performance reviews" in another area of the building. [*Id*.] Drawing reasonable inferences in the light most favorable to Mochu, a reasonable factfinder could conclude that Kuhn was upset that Mochu complained of discrimination and that is why, after realizing that Mochu was the only applicant and would be working as her assistant, she took the posting down on the pretext that a technical specialist was no longer needed. A jury may not believe Mochu's version of events, but they must be allowed to consider it.

34

Mochu's retaliation claim survives summary judgment, though that claim is also limited to Defendant's decision to deny Mochu a promotion to technical specialist in 2022.

### C.    Harassment and Hostile Work Environment (Count II)

Count II of Mochu's complaint is for harassment and hostile work environment. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 851 (7th Cir. 2019) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). "A hostile work environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To prevail on a Title VII hostile work environment claim, "a plaintiff must show that '(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability.'" *Mahran v. Advocate Christ Medical Center*, 12 F.4th 708, 714 (7th Cir. 2021) (quoting *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018)).

Before delving into the elements, the Court first considers Defendant's argument that the hostile work environment claim is untimely to the extent that it is based on events that occurred when Shelk was supervisor in 2013 and 2014.

### 1. Timeliness

Defendant argues that any alleged acts of harassment that occurred while Shelk was supervisor are no longer actionable because Mochu "got along with his … two supervisors from 2015 to 2019, thereby rendering any acts committed by Shelk untimely and unrelated to any later events." [Dkt. 52 at 12.] The Court agrees with Defendant that the hostile work environment Mochu experienced under Shelk in 2013 and 2014 is not actionable, but it may nonetheless be relevant as background evidence of the hostile work environment that Mochu allegedly experienced after Kuhn became supervisor in 2019.

"[H]ostile work environment claims by '[t]heir very nature involve[ ] repeated conduct" and "occur[ ] over a series of days or perhaps years.'" *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) (quoting *Morgan*, 536 U.S. at 115). "Thus, if the alleged conduct forms a single unlawful employment practice falling at least in part within the statutory period, the court may consider conduct outside the statute of limitations as part of the hostile work environment claim." *Id*. But "[e]ven though the statute of limitations allows plaintiffs 'to drag up ancient history, to the employer's prejudice,' the length of time between incidents has been a consistent limiting factor" and "[l]arge gaps between incidents prevent[] the allegations from forming a single employment practice." *Id*. (citing *Tinner v. United Ins. Co. of America*, 308 F.3d 697, 708-709 (7th Cir. 2002)). In *Milligan-Grimstad*, the plaintiff alleged a hostile work environment for six years, followed by a gap as large as two or three years before the work environment became hostile against and the plaintiff was

36

fired. The court found that the two periods of harassment did not form a single unlawful employment practice. See *id.* at 713; see also *Tinner*, 308 F.3d at 709 (plaintiff could not "piggy-back" earlier incidents of alleged discrimination to timely filed wrongful termination claim to form continuing violation under Title VII; he "was not reasonable in waiting until 1996 to file his charge alleging racial discrimination for acts that occurred in 1990, 1993, and 1994").

In this case, like in *Milligan*, the evidence supporting Mochu's hostile work environment claim falls into two distinct time periods, separated by a gap of around three years from 2016 until at least 2019. Mochu does not identify any alleged acts of harassment that occurred between the incident in 2016 when Kuhn told Noorani that the prep staff did not see Mochu as a leader and Defendant's decision in March 2020 to place Mochu on paid furlough. Mochu testified that he got along well with both of his supervisors (Noorani and Miklos) during that period, and that Miklos' selection as supervisor was a good response to concerns he had raised about Kuhn applying for the supervisor role. Based on this record, there is insufficient evidence that the two periods of harassment should be considered a single unlawful employment practice. There was a "substantial passage of time without incident known to" Defendant; there were two "change[s] in [Mochu's] supervisors"; and Defendant took "intervening remedial action" including terminating Shelk and declining to hire Kuhn when she applied as supervisor in 2015 and 2016. *Ford*, 942 F.3d at 854. These factors all weigh against considering the earlier period of harassment to be part of the same unlawful

employment practice. Therefore, the Court limits the hostile work environment claim to the period after Kuhn took over as supervisor.

That said, Defendant has not demonstrated that evidence from the earlier time period is irrelevant for any purpose. It might be appropriate background evidence of the harassment that Mochu allegedly experienced during the actionable period, as discussed below. See *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (plaintiff's ten reassignments that occurred more than 300 days before he filed an EEOC charge were time barred but could still be considered as background evidence of his last two actionable transfers) (citing *Morgan*, 536 U.S. at 113); see also *Hopkins v. Board of Education of City of Chicago*, 73 F. Supp. 3d 974, 983 (N.D. Ill. 2014).

### 2.     Severe and pervasive harassment

Defendant argues that Mochu cannot establish that any of the harassment that he experienced since Kuhn's promotion was severe and pervasive. "[C]ourts consider the totality of the circumstances when determining whether conduct is severe or pervasive." *Scaife v. United States Department of Veterans Affairs*, 49 F.4th 1109, 1115–16 (7th Cir. 2022) (citing *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013)). "This includes (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Id.* "[S]tatements by supervisors are taken more seriously than co-workers' statements." *Melgoza v. Rush University Medical Center*, 499 F.

Supp. 3d 552, 574 (N.D. Ill. 2020); see also *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 638 (7th Cir. 2019)). However, "employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear*, 911 F.3d at 881.

Taken as a whole, a reasonable jury could conclude that the hostile work environment Mochu experienced was severe and pervasive. According to Defendant, Mochu's only evidence of harassment during the actionable period consists of Ortiz yelling at Mochu a time or two; his being placed on paid furlough; and his disagreeing with several performance reviews. [See Dkt. 52 at 13.] This summary downplays the record. Most obviously, Defendant ignores evidence that Kuhn denied Mochu the promotion to technical specialist even though he was qualified and the only applicant.

More broadly, the record reflects other incidents of alleged harassment beginning in or around 2020. After he returned from furlough, Mochu filed an EEOC charge in June 2020. In July 2020, Mochu alleges that Ortiz "yelled at him" during a team meeting when Mochu "tried to apologize to everyone in the department for a policy change" that was implemented after Mochu left the campus one day without supervisor permission. [Dkt. 51, ¶ 111.] Mochu alleges that Ortiz "continued to yell at him in her office afterwards." [*Id*.] According to Root's affidavit, Ortiz "harshly berated and mistreated" Mochu when he raised the new policy at the team meeting. [Dkt. 64-3 at 2, ¶ 9.]

That fall, Kuhn gave Mochu and Root performance reviews, even though Defendant's president and CEO had announced a flat merit increase without

performance reviews for all employees. [See Dkt. 64-1 at 1, ¶ 3; Dkt. 64-3 at 3, ¶ 17.] According to Mochu, his performance review was inaccurate; Root avers the same. [See Dkt. 64-1 at 1, ¶ 3; Dkt. 64-3 at 3, ¶ 17.] Defendant stresses that company leaders, such as lab director Mamta Patel, were still permitted to complete performance reviews, and Patel "believed it was important for her team to complete reviews to provide feedback to team members on their performance." [Dkt. 60 at 3; Dkt. 51 at ¶ 87.] This may be the case, but as Mochu notes, Mochu and Root were the only lab employees who received performance evaluations. At least according to Mochu, Kuhn singled them out for performance reviews to intimidate them and create a paper trail to eventually terminate them, in retaliation for complaining about discrimination.

In November 2021, Patel yelled at and intimidated Mochu "for simply asking a clarifying question concerning backlog issues." [Dkt. 64-1 at 1, ¶ 7.] During a team meeting that same month, Mochu alleges that Patel divulged that Mochu and Root had raised concerns about Kuhn becoming their supervisor. [Dkt. 64-3 at 3, ¶ 11.] The next month, December 2021 (while Mochu's application for the technical specialist role was pending), Kuhn raised a concern about Mochu with the new AP director because Mochu went over the 100 hour per pay period hours limit by .02 seconds. According to Mochu, "it turned out there were seven other team members who went over the time limit by a lot" and Khun did not speak with them or bring them to the new AP director. [Dkt. 64-1, ¶ 9.] Defendant refutes this statement only by asserting that it "is unsupported by any record evidence." [Dkt. No. 60 at 3.]

In January 2022, Mochu was told the technical specialist position had been closed, but it continued to be advertised until Mochu complained to leadership that he was being discriminated against, and then it was immediately taken down. [Dkt. 64-1, ¶¶ 10-17.] In April 2022, Mochu claims that Kuhn yelled at him and allegedly pounded on her desk while insisting Mochu provide examples of how she had discriminated against him. [Dkt. 64-1, ¶ 18.] In July 2022, Mochu notified Defendant that he would be switching certain workdays in November for weekends, which was standard practice in the cytology department. Defendant did not object, but after Mochu worked the schedule he had indicated, he was placed on Level 1 corrective action—a step toward termination—on the basis that he was not allowed to switch any days. [Dkt. 64-1 at 2, ¶¶ 22-26.]

The record also contains evidence of harassment that does not directly involve Mochu. For instance, when Kuhn took over as supervisor in 2019, she told all employees who were of Indian heritage they could not communicate with one another in Hindi and that, if they did, she would issue corrective action. [Dkt. 64-4 at 1 (Dharmaiah affidavit).] She also penalized all Indian employees during their next performance reviews. [*Id.*]

Taken as a whole, the record reflects more than just "isolated incidents" and "other unpleasantries" that are "not uncommon in the workplace." *Swyear*, 911 F.3d at 881. A jury should be allowed to decide based on the totality of the circumstances whether the hostile work environment was severe and pervasive. Most of the conduct was by supervisors, whose actions are given more weight than that of co-workers,

*Gates*, 916 F.3d at 638; and much of it was directed at the victim (here, Mochu) which also entitles the evidence to more weight. *Melgoza*, 499 F. Supp. 3d at 574.

Considering the remaining factors outlined in *Melgoza*, the complained-of harassment was relatively frequent. According to Root, Kuhn "regularly belittled, yelled at, and threatened Mr. Mochu," and her behavior did not change even after Root reported discrimination. [Dkt. 55-2 at 3, ¶ 15.] Mochu has also provided specific examples of harassing conduct after Kuhn was promoted to supervisor. A reasonable person could deem it offensive for a supervisor to target an employee; indeed, Mochu's co-workers deemed it offensive and have filed affidavits in support of Mochu. Although none of the alleged incidents of harassment were physically threatening, at least some of what is discussed above is arguably humiliating.

In sum, this evidence is sufficient to leave it to a jury to decide if Mochu experienced a severe and pervasive hostile work environment. Though the evidence is not overwhelming, it need not be at the summary judgment stage.

### 3.  Causation

Defendant argues that "there is no evidence that any of the alleged conduct occurred because of Mochu's race, color or national origin." [Dkt. 52 at 13.] Defendant's focus is too limited, however. A plaintiff can establish the causation element of a hostile work environment claim with proof that "the harassment was based on membership in a protected class *or* in retaliation for protected behavior." *Mahran*, 12 F.4th at 714 (emphasis added).

In this case, the same evidence that supports the causation elements of Mochu's discrimination and retaliation claims also supports the causation element of

his hostile work environment claim. Though Mochu does not have an actionable hostile work environment claim for the period during which Shelk was Mochu's supervisor (2013-2014), evidence from that period may nonetheless be relevant to evaluating Kuhn's motives. For instance, Kuhn exchanged emails with Shelk about how they could "get rid" of Mochu, and in one of those emails Shelk referred to Mochu as a "monkey." Noorani found the email so offensive that he immediately took the folder to Ortiz. He has also submitted an affidavit stating that he found the emails to be "in complete violation of the just culture assured by the code of conduct and offensive in many respects." [Dkt. 64-2, ¶¶ 10-12.] Of course, it was Shelk, not Kuhn, who used the offensive language in the pair's email exchanges, but Kuhn participated in the email exchanges, which contained a discussion about how to "get rid" of Mochu. Considered as a whole, the evidence is sufficient to let a jury assess causation.

### 4. Basis for employer liability

Finally, Defendant argues that there is no basis for employer liability because Advocate investigated all of Mochu's complaints, including his complaints against Kuhn, but was not able to substantiate them. [See Dkt. 52 at 13.] Defendant is not entitled to summary judgment on this basis. "Different standards apply in evaluating an employer's liability for a hostile work environment, depending on whether the alleged harasser is the victim's supervisor or coworker." *Trahanas v. Northwestern University*, 64 F.4th 842, 853 (7th Cir. 2023) (citing *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022)). For supervisors, an employer is strictly liable when a "supervisor's harassment culminates in a tangible employment action." *Vance*, 570

U.S. at 424. "Absent such action, an employer may raise an affirmative defense to avoid liability." *Trahanas*, 64 F.4th at 853. In this case, the primary alleged harasser, Kuhn, is Mochu's supervisor and her harassment is alleged to have culminated in a tangible employment action, namely a denied promotion to technical specialist in 2022. Therefore, there is a basis for employer liability and an affirmative defense is not available.

## IV. Conclusion

For these reasons, Defendant's motion for summary judgment is granted in part and denied in part. Mochu's claims for Title VII discrimination and retaliation are limited to the adverse employment action of Defendant's decision to deny Mochu a promotion to technical specialist in 2022. Mochu's hostile work environment claim is limited to the period after Stephanie Kuhn became Mochu's supervisor in early 2019. Defendant's motion for summary judgment is otherwise denied.

Enter: 20-cv-7035
Date: August 2, 2023

_____
Lindsay C. Jenkins
United States District Judge